RECEIVED

JUN 3 0 2011

AT 8:30_____M
WILLIAM T. WALSH
CLERK

**NOT FOR PUBLICATION**

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

BORIS BORETSKY,                     :
                                    :      Civil Action No. 08-2265 (GEB)
              Plaintiff,            :
                                    :
       v.                           :      **OPINION**
                                    :
JON CORZINE, et al.,                :
                                    :
              Defendants.           :

**APPEARANCES:**

Plaintiff pro se                    Counsel for Defendants
Boris Boretsky                      Daniel Michael Vannella
New Jersey State Prison             Deputy Attorney General
P.O. Box 861                        New Jersey Division of Law
Trenton, NJ  08625-0861            RJ Hughes Justice Complex
                                    25 Market Street
                                    P.O. Box 112
                                    Trenton, NJ  08625

**BROWN, JR.**, Chief Judge

       Plaintiff Boris Boretsky is a state prisoner alleging

various violations of his civil rights and seeking relief under

42 U.S.C. § 1983.

       On May 12, 2008, Plaintiff and approximately thirty-nine

other prisoners filed a Complaint [1] against various state

officers and correctional employees for alleged violations of

their constitutional rights while incarcerated, among other

claims.  On June 23, 2008, the Court entered its Opinion and

Order [19, 20] dismissing all co-plaintiffs from this action

except for Boris Boretsky, with the instruction that new and separate cases would be opened for the enumerated co-plaintiffs. The Court's Order also stated that, within thirty days, each plaintiff, including Plaintiff Boretsky, could indicate his intent to proceed with his separate case by filing an amended complaint asserting his individual claims.[1]

On August 1, 2008, Plaintiff Boretsky filed his Second Amended Complaint [50] asserting his individual claims.  On November 20, 2008, pursuant to its obligation to review prisoner complaints to determine whether they should be dismissed on various grounds, see, e.g., 28 U.S.C. §§ 1915, 1915A, and 42 U.S.C. § 1997e, this Court entered its Opinion and Order [63, 64]:  (1) allowing Plaintiff's Eighth Amendment conditions-of-confinement claim to proceed against all Defendants; (2) allowing Plaintiff's First Amendment free-exercise claim to proceed against Defendants Milgram, Hayman, Ricci, Mee, Jr., and Bell; (3) allowing Plaintiff's claim under the Religious Land Use and Institutionalized Persons Act to proceed against Defendants Milgram, Hayman, Ricci, Mee, Jr., and Bell; (4) allowing

---

[1] On July 7, 2008, Plaintiff Boretsky and twenty-two co-plaintiffs together filed the first amended complaint [24].  On July 23, 2008, the Court entered an Order [41] dismissing the amended complaint filed by the twenty-three co-plaintiffs and allowing the co-plaintiffs fourteen days to file amended complaints asserting their individual claims.  The Court of Appeals has entered its judgment [164] affirming the dismissal of the co-plaintiffs' claims.

2

Plaintiff's Due Process claim arising out of Plaintiff's transfer to "isolation" to proceed against Defendants Milgram, Hayman, Ricci, Mrr, Jr., and Bell; (5) dismissing with prejudice Plaintiff's claim under the Religious Freedom Restoration Act; and (6) dismissing all of Plaintiff's other claims without prejudice.  The Court again granted Plaintiff leave to file a third amended complaint within 30 days, but ordered that Plaintiff may not assert any _new_ claims in any such third amended complaint.

On January 12, 2009, Plaintiff filed his Third Amended Complaint [72].[2]  By Opinion and Order [125, 126] entered February 16, 2010, this Court dismissed Plaintiff's claims against Defendants Jon Corzine and Anne Milgram.  On September 17, 2010, pursuant to a stipulation of the parties, this Court entered an Order [145] dismissing with prejudice the following claims:  Plaintiff's Eighth Amendment conditions-of-confinement

---

[2] The named Defendants in the Third Amended Complaint include:  New Jersey Governor Jon Corzine, New Jersey Attorney General Anne Milgram, New Jersey Department of Corrections Commissioner George W. Hayman, New Jersey State Prison Administrator Michelle Ricci, New Jersey State Prison Associate Administrator Donald Mee, Jr., New Jersey State Prison Assistant Superintendent James Drumm, New Jersey State Prison Assistant Superintendent Charles Warren, New Jersey State Prison Assistant Superintendent Jeffrey Bell, New Jersey State Prison Executive Assistant Brenda Smith Hutton, New Jersey State Prison Supervisor of Education Thomasw Dechan, New Jersey State Prison Assistant Supervisor of Education Deniece Gray, New Jersey State Prison Lt. Emrich, and New Jersey State Prison Remedy Forms Coordinator Frank Bruno.

claim against Defendants Dechan and Gray; Plaintiff's First
Amendment free-exercise claims against Defendants Dechan, Gray,
Emrich and Bruno; Plaintiff's Religious Land Use and
Institutionalized Persons Act claims against Defendants Dechan,
Gray, Emrich and Bruno; Plaintiff's due process claims against
Defendants Dechan, Gray and Emrich; Plaintiff's access-to-court
claims asserted against Defendant Emrich; Plaintiff's conspiracy
claims against Defendant Emrich; Plaintiff's retaliation claims
against Defendant Emrich; Plaintiff's failure-to-supervise and/or
failure-to-train claims against Defendant Emrich; Plaintiff's
RICO claims against Defendant Emrich; and Plaintiff's claims for
punitive damages against Defendant Emrich.

On November 30, 2010, the remaining defendants filed this
Motion [152] for Summary Judgment with respect to all remaining
claims.  Plaintiff has filed his opposition [155, 162] to which
the defendants have replied [163] in support of their Motion.
This matter is now ready for decision.

## I.  BACKGROUND

Except as otherwise noted, the following facts are
undisputed.[3]

_____

[3] Plaintiff has failed to submit a counterstatement of
material facts as required by Local Civil Rule 56.1(a).  In his
Third Amended Complaint or in his Amended Opposition [162] to the
Motion, Plaintiff raises for the first time new claims of an ex
post facto violation, a new retaliation claim, a new and distinct
claim of denial of access to the courts, and an equal protection
violation.  In granting Plaintiff leave to file a Third Amended

Pursuant to his conviction for purposeful murder and related offenses, Plaintiff is serving a life sentence without possibility of parole.  Since approximately April 28, 2006, Plaintiff has been confined at New Jersey State Prison, a maximum-security correctional institution.

On or about April 3, 2008, Plaintiff's housing assignment was changed to the newly-created Special Sentencing Unit (SSU) Unit 2A.[4]  The sole criteria for housing placement in SSU Unit 2A was a conviction for murder resulting in a sentence of life imprisonment without the possibility of parole, or a death sentence that had been commuted.  (Motion, Hutton Decl. Ex. L.) Plaintiff received a Classification Committee review of his change in housing assignment on or about April 8, 2008. Plaintiff remained assigned to SSU Unit 2A until approximately February 18, 2010.

The SSU Unit 2A consists of two tiers, with 24 cells on each tier, for a total of 48 cells.  The SSU Unit 2A was a general population unit within itself, but the SSU Unit 2A inmates were kept separate from other inmates at NJSP.  Thus, SSU Unit 2A

---

Complaint, this Court expressly forbade the assertion of any new claims.  It is not appropriate to raise new claims in this fashion and, in light of the fact that this Court had granted Plaintiff previous opportunities to amend the Complaint, this Court will not consider these claims at this late juncture.  See, e.g., Fed.R.Civ.P. 15(a)(2), (c).

[4] The SSU is no longer in operation, having been closed in March 2010.

inmates, including Plaintiff, were allowed privileges including taking meals in a communal dining area, telephone privileges, window visits, legal services,[5] communal religious services,[6] daily outdoor recreation, daily evening indoor recreation on the unit (including chess, checkers, cards, television, and use of the recreation area), gym time, showers, medical services, and haircuts.

Before being housed in SSU Unit 2A, Plaintiff held a job in cell sanitation. (Motion, Hutton Decl., Ex. A.) While housed in SSU Unit 2A, Plaintiff held a job as a social worker from April 14, 2008 to June 25, 2009; thereafter, he held a job in cell sanitation through March 2010. (Motion, Hutton Decl., Ex. A; Vannella Decl., Ex. 3.)

While housed in SSU Unit 2A, Plaintiff attended three educational programs, completing one. (Motion, Hutton Decl., Ex. A; Vannella Decl., Ex. 2.)

---

[5] Inmates housed in the SSU were permitted to request paralegal inmate services. In addition, the SSU Unit 2A contained a law library, a Lexis Nexis computerized law library, word processors, a printer, and various legal forms.

[6] Prisoners, including Jewish prisoners, in SSU Unit 2A were permitted to participate in weekly group religious services. In addition, Jewish prisoners in SSU Unit 2A were permitted to observe the first and last two days of Yom Kippur, Pesach (Passover), Rosh Hashanah, Succoth Purim, Shavuot, Tisha Ba'av, and other holy days and festivals. (Motion, Hutton Declaration, Ex. K.) They also are permitted to possess and wear an approved form of Yarmulke and to possess religious study materials.

On February 18, 2010, Plaintiff was transferred out of SSU Unit 2A to the infirmary, for injuries he suffered during a fight with another inmate that day.  (Motion, Vannella Decl., Ex. 1.) Plaintiff received two disciplinary charges as a result of that incident.  Following an administrative hearing, Plaintiff was found guilty of violation *.004, fighting with another person, and violation *.306, conduct which disrupts the orderly running of the institution.  Disciplinary sanctions imposed for these violations included, in the aggregate, 30 days of detention, 545 days administrative segregation, with 60 days suspended, 90 days loss of recreation privileges, and loss of contact privileges. After his release from the infirmary, Plaintiff was transferred to Close Custody Unit 2B, then to Detention Unit 1 Left, then to Administrative Segregation Unit 7 Right.  Detention in those units was unrelated to his detention in SSU Unit 2A.  Plaintiff never returned to SSU Unit 2A, which is no longer operational.

In the Third Amended Complaint at issue here, dated January 12, 2009, Plaintiff asserts the following claims, excluding those already dismissed: (1) the transfer to SSU Unit 2A violated Plaintiff's right to due process because he did not receive prior notice or a written explanation and because it confined him to "isolation" status, asserted against Defendants Hayman, Ricci, Mee, Bell, Drum, Warren, and Hutton; (2) while in SSU Unit 2A, Plaintiff was deprived of his rights to free exercise of his

7

religion under the First Amendment and under RLUIPA, 42 U.S.C. § 2000cc, et seq., in that he was "denied access to religious services to practice his Jewish Religion," and in that the SSU Unit 2A does not provide daily morning prayers and Shabbat services for its inmates, asserted against Defendants Hayman, Ricci, Mee, Bell, Drum, Warren, and Hutton; (3) Plaintiff was deprived of his right of access to the courts, asserted against all Defendants except Emrich and Bruno; (4) the conditions of his confinement in SSU Unit 2A violated his Eighth Amendment right to be free from cruel and unusual punishment, asserted against Defendants Hayman, Ricci, Mee, Bell, Drumm, Warren, Hutton, Emrich, and Bruno; (5) the transfer to SSU Unit 2A was in retaliation for former Governor Corzine's decision to abolish the death penalty, to show the citizens of the state that the Governor and the state administration are still hard on crime; (6) violations of his constitutional rights resulted from various Defendants' failure to train and/or supervise; (7) he was harmed by violations of the RICO statutes; (8) conspiracy claims; and (9) a claim for punitive damages, asserted against all Defendants except Hutton and Bruno.

The remaining Defendants have moved for summary judgment, asserting that certain claims are unexhausted and that others are meritless.  The Moving Defendants have supported their Motion with a statement of material facts and supporting documentary

8

evidence, including relevant portions of Plaintiff's deposition transcript.

## II.   SUMMARY JUDGMENT

### A.   Federal Rule of Civil Procedure 56

A district court shall grant summary judgment, as to any claim or defense, "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a).

A party asserting that a fact cannot be, or is genuinely disputed, must support the assertion by citing to particular parts of materials in the record, or by showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact. Fed.R.Civ.P. 56(c)(1). Nevertheless, the court may consider other materials in the record. Fed.R.Civ.P. 56(c)(3).

Rule 56(e) of the Federal Rules of Civil Procedure further provides that:

> If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may:
>
> (1)   give an opportunity to properly support or address the fact;
>
> (2)   consider the fact undisputed for purposes of the motion;

> (3)   grant summary judgment if the motion and
>        supporting materials - including the facts
>        considered undisputed - show that the movant is
>        entitled to it; or
>
> (4)   issue any other appropriate order.

Fed.R.Civ.P. 56(e).

No genuinely triable issue of material fact exists when the moving party demonstrates - based on the submitted evidence, and viewing the facts in the light most favorable to the non-moving party - that no rational jury could find in the non-movant's favor. Ambruster v. Unisys Corp., 32 F.3d 768, 777 (3d Cir. 1994). Thus, the threshold enquiry is whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). In deciding whether triable issues of material fact exist, a court must view the underlying facts and draw all reasonable inferences in favor of the non-moving party. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Pennsylvania Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995); Hancock Indus. v. Schaeffer, 811 F.2d 225, 231 (3d Cir. 1987).

The rule does not increase or decrease a party's ultimate burden of proof on a claim. Rather, the moving party bears the burden of showing no genuine issue of material fact, and the non-movant opposes the motion by presenting affirmative evidence to

10

the contrary.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242,
256-57 (1986).  Under the Rule, once the moving party has
properly supported its showing of no triable issue of fact and of
an entitlement to judgment as a matter of law, "its opponent must
do more than simply show that there is some metaphysical doubt as
to the material facts." Matsushita, 475 U.S. at 586 (citations
omitted).  See also Anderson, 477 U.S. at 247-48 ("By its very
terms, this standard provides that the mere existence of some
alleged factual dispute between the parties will not defeat an
otherwise properly supported motion for summary judgment; the
requirement is that there be no genuine issue of material
fact.").

     What the non-moving party must do is "go beyond the
pleadings and by [its] own affidavits, or by the 'depositions,
answers to interrogatories, and admissions on file,' designate
'specific facts showing that there is a genuine issue for
trial.'" Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); see
also Lujan v. National Wildlife Fed'n, 497 U.S. 871, 888 (1990)
("The object of [former Rule 56(e), new Rule 56(c)] is not to
replace conclusory allegations of the complaint ... with
conclusory allegations of an affidavit."); Anderson, 477 U.S. at
249; Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358,
1363 (3d Cir. 1992), cert. denied, 507 U.S. 912 (1993) ("To raise
a genuine issue of material fact, ... the opponent need not

match, item for item, each piece of evidence proffered by the movant," but must "exceed[] the ' mere scintilla' threshold and ... offer[] a genuine issue of material fact.").

A movant need not affirmatively disprove the other party's case; he may move on the ground that the non-movant lacks evidence "sufficient to establish the existence of an element essential to that party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). Nevertheless, again, it is not sufficient to support a motion with only conclusory assertions that the non-movant has no evidence to prove his case. To the contrary, as Justice White warned, in his concurring opinion in Celotex, "It is the defendant's task to negate, if he can, the claimed basis for the suit." Celotex, 477 U.S. at 328 (Justice White, concurring). Celotex's progeny reflects that sentiment – that the movant bears the burden of demonstrating the lack of evidence in the record to support the non-movant's claims. See, e.g., Haywood v. Nye, 999 F.Supp. 1451, 1463 (D. Utah 1998); Andrews v. Crump, 984 F.Supp. 393, 402-03 (W.D.N.C. 1996).

It is not necessary that the case be fully adjudicated on a motion for summary judgment.

> If the court does not grant all the relief requested by the motion, it may enter an order stating any material fact – including an item of damages or other relief – that is not genuinely in dispute and treating the fact as established in the case.

Fed.R.Civ.P. 56(g).

Finally, after giving notice and a reasonable time to
respond, the court may:

(1) grant summary judgment for a nonmovant;

(2) grant the motion on grounds not raised by a party;
or

(3) consider summary judgment on its own after
identifying for the parties material facts that
may not be genuinely in dispute.

Fed.R.Civ.P. 56(f).

B.   New Jersey Local Civil Rule 56.1

New Jersey Local Civil Rule 56.1(a), as amended in 2008,
requires that on summary judgment motions, both the moving and
non-moving parties furnish a statement identifying what each side
deems to be the material facts, so that the Court can determine
if a genuine dispute exists.  The commentary to the Rule notes
that "the requirement of a separate document represents a change
from the practice under the former version of the rule," and that
"[t]he Rule 56.1 statement is viewed by the Court as a vital
procedural step, since it constitutes and is relied upon as a
critical admission of the parties."  The commentary specifies the
content and format of the statement: e.g., the assertions must be
set out in separately numbered paragraphs; each fact must be
supported by a citation to an affidavit.

Consequences of a movant's noncompliance with the Rule can
be severe—"[a] motion for summary judgment unaccompanied by a
statement of material facts not in dispute shall be dismissed."

13

L.Civ.R. 56.1(a).  See also Kee v. Camden County, 2007 U.S. Dist. LEXIS 23637, at *14 (D.N.J. 2007) (Simandle, Jr.); Langan Eng'g & Envtl. Servs. v. Greenwich Ins. Co., 2008 U.S. Dist. LEXIS 99341 (D.N.J. 2008) (Greenaway, J.).  Where an opposition brief is not accompanied by a Rule 56.1 statement, the movant is not automatically entitled to summary judgment.  Instead, the judge "may enter summary judgment in favor of the moving party only if the moving party has established that summary judgment is appropriate."  Cornelio v. Coupon Serv. Corp., 2007 U.S. Dist. LEXIS 213, 15 *5 (D.N.J. 2007) (Pisano, J.).  Such a scenario is predicated on the movant having filed a Rule 56.1 statement.

The Court is mindful of the fact that Plaintiff is a pro se litigant, and district court judges often relax procedural rules, including Local Civil Rule 56.1(a), for an unrepresented litigant.  See, e.g., Jordan v. Allgroup Wheaton, 218 F.Supp.2d 643, 646 (D.N.J. 2002) (Irenas, J.), aff'd, 95 Fed.Appx. 462 (3d Cir. 2004) (pro se plaintiff's failure to submit a Rule 56.1 statement leads court instead to draw relevant facts "primarily from Plaintiff's complaint, and the transcript of Plaintiff's deposition testimony, Defendant's Statement of Undisputed Material Facts and supporting exhibits").

A court may excuse the failure to submit a Rule 56.1 statement where there is no evidence of bad faith.  See, e.g., Rumbas v. Borough of Lawnside, 2008 U.S. Dist. LEXIS 60712

14

(D.N.J. 2008) (Simandle, Jr.); <u>Shirden v. Cordero</u>, 509 F.Supp.2d 461, 463-64 n.1 (D.N.J. 2007) (Martini, Jr.) (stating "lack of compliance with the Local Civil Rules has made it difficult and time-consuming for the Court to determine whether a genuine issue of material fact exists. Nonetheless, the Court, having found no evidence of bad faith, will decide Defendants' motion on its merits").  A judge may relax the Rule as well where the interests of justice so require, which most commonly arises when both parties fail to comply.  For example, in <u>Kee v. Camden County</u>, 2007 U.S. Dist. LEXIS 23637, at *16 (D.N.J. 2007), Judge Simandle decided to adjudicate a summary judgment motion where "both parties were equally lax in their compliance[,]" and where doing so was "in the best interest of the parties and justice." Nonetheless, before reaching this conclusion, he admonished defendants for providing "little in the way of support for their motion of summary judgment" and relying on documentary evidence and plaintiff's deposition, as well as plaintiff for submitting disorganized exhibits.  <u>Id.</u> at *15.  Judges throughout this District since have agreed with Judge Simandle's position, even after the 2008 amendments became effective.  <u>E.g.</u>, <u>Langan Eng'g & Envtl. Servs. v. Greenwich Ins. Co.</u>, 2008 U.S. Dist. LEXIS 99341 (D.N.J. 2008) (Greenaway, J.); <u>Apata v. Howard</u>, 2008 U.S. Dist. LEXIS 72321 (D.N.J. 2008) (Irenas, J.).

15

III.   SECTION 1983 ACTIONS

A plaintiff may have a cause of action under 42 U.S.C. § 1983 for certain violations of his constitutional rights. Section 1983 provides in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress ... .

Thus, to state a claim for relief under § 1983, a plaintiff must allege, first, the violation of a right secured by the Constitution or laws of the United States and, second, that the alleged deprivation was committed or caused by a person acting under color of state law. West v. Atkins, 487 U.S. 42, 48 (1988); Piecknick v. Pennsylvania, 36 F.3d 1250, 1255-56 (3d Cir. 1994).

IV.   DISCUSSION

A.   Unexhausted Claims

Defendants assert that Plaintiff failed to exhaust his administrative remedies with respect to (1) his claims of violation of his rights to free exercise of his religion, under both the First Amendment and RLUIPA, 42 U.S.C. § 2000cc, et seq., and (2) his claims of cruel and unusual conditions of confinement in violation of the Eighth Amendment.

16

1.   <u>Exhaustion of the Religious Claims</u>

Here, in April and May 2008, Plaintiff filed remedy forms
challenging an alleged lack of Thursday prayer service, weekday
prayer, denial of his desire to participate in religious
activities with inmates in the general population of the prison,
and a general denial of his right to practice his Jewish faith.
In response, a staff person explained that the Rabbi was on
vacation and that services would resume upon his return.
Plaintiff appealed and was told on May 15, 2008, that Jewish
services had resumed.  (Motion, Hutton Decl.)  Defendants assert
that the issue was satisfactorily resolved and that if Plaintiff
had any further challenges to the alleged limitations on his
ability to practice his faith he should have submitted new
administrative remedies.  Plaintiff counters that it would have
been an abuse of the administrative remedy process to submit
repeated administrative remedies on the same subject.

It appears that Plaintiff did exhaust, in April and May
2008, his administrative remedies with respect to most of his
claims regarding the limitations on his religious observances.
Accordingly, those claims will be addressed on the merits, below.

2.   <u>The Claim of Cruel and Unusual Punishment</u>

Plaintiff asserts that he was subjected to cruel and unusual
punishment, in violation of the Eighth Amendment, based upon
alleged exposure to toxic substances in the air and water, being

17

flooded out with a combination of "urine/feces water," no running
hot water, poor ventilation, and limited recreation (including
outdoor recreation in a cage and no opportunity to play games
such as basketball and handball).

Plaintiff failed to file administrative remedy forms
regarding these claims of unsafe conditions of confinement.
Accordingly, the Defendants are entitled to summary judgment with
respect to these claims.

B.   Due Process Claim

Plaintiff asserts that he was deprived of liberty without
due process when he was transferred to the SSU Unit 2A without
prior notice and because it subjected him to "isolation" status.

A liberty interest protected by the Due Process Clause may
arise from either of two sources:  the Due Process Clause itself
or State law.  See Hewitt v. Helms, 459 U.S. 460, 466 (1983);
Asquith v. Department of Corrections, 186 F.3d 407, 409 (3d Cir.
1999).

With respect to convicted and sentenced prisoners, "[a]s
long as the conditions or degree of confinement to which the
prisoner is subjected is within the sentence imposed upon him and
is not otherwise violative of the Constitution, the Due Process
Clause does not in itself subject an inmate's treatment by prison
authorities to judicial oversight." Montanye v. Haymes, 427 U.S.

18

236, 242 (1976), quoted in Hewitt, 459 U.S. at 468 and Sandin v. Conner, 515 U.S. 472, 480 (1995).

States, however, may confer on prisoners liberty interests that are protected by the Due Process Clause. "But these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." Sandin, 515 U.S. at 484 (finding that disciplinary segregation conditions which effectively mirrored those of administrative segregation and protective custody were not "atypical and significant hardships" in which a state conceivably might create liberty interest).

The Supreme Court has noted that, "[i]n Sandin's wake the Courts of Appeals have not reached consistent conclusions for identifying the baseline from which to measure what is atypical and significant in any particular prison system." Wilkinson v. Austin, 545 U.S. 209, 223 (2005) (finding confinement in Ohio's "supermax" prison to be an "atypical and significant" hardship).[7]

---

[7] Where a liberty interest in avoiding "atypical and significant hardship" conditions of confinement is established, the question of what process is due is determined by reference to the framework set forth in Mathews v. Eldridge, 424 U.S. 319 (1976).

19

It is well established, however, that a prisoner possesses no liberty interest arising from the Due Process Clause in a particular custody level or place of confinement. See, e.g., Olim v Wakinekona, 461 U.S. 238, 245-46 (1983); Hewitt, 459 U.S. at 466-67; Meachum v. Fano, 427 U.S. 215, 224-25 (1976); Montanye, 427 U.S. at 242.  Nor does a prisoner have a liberty interest in a particular housing assignment within a prison system.  See McKune v. Lile, 536 U.S. 24, 39 (2002) ("It is well settled that the decision where to house inmates is at the core of prison administrators' expertise."); Hewitt v. Helms, 459 U.S. 460 (no liberty interest in remaining in general population rather than administrative segregation); Asquith, 186 F.3d at 411-12 (return to prison from halfway house did not impose "atypical and significant hardship" on prisoner and, thus, did not deprive him of protected liberty interest); Barr v. DiGuglielmo, 2008 WL 2786424 (E.D. Pa. 2008) (no liberty interest in being housed in particular wing of prison).  But see Wilkinson v. Austin, 545 U.S. 209 (2005) (Ohio prisoners have state-created liberty interest in avoiding assignment to "supermax" prison). Thus, the Court of Appeals for the Third Circuit has held that New Jersey prisoners have no liberty interest, under either the United States Constitution or state law, in avoiding transfer to a Security Threat Group Management Unit, a restrictive prison

20

unit housing gang members, even without a hearing.   See Fraise v. Terhune, 283 F.2d 506, 522-23 (3d Cir. 2002).

Similarly, here, Plaintiff has failed to establish that he had a liberty interest in avoiding assignment to SSU Unit 2A. Contrary to Plaintiff's characterization, he has not been confined to "isolation;" rather, he has been confined to a unit housing violent prisoners convicted of murder, but who nevertheless enjoy many communal activities, including recreation, dining, employment, and educational and religious programs.[8]  The conditions of the SSU Unit 2A do not rise to the level of "atypical and significant hardship."  Moreover, as Plaintiff is subject to confinement in SSU Unit 2A even without a hearing, cf. Fraise v. Terhune, he cannot base a due process claim upon any alleged unfairness in the hearing he received.[9]

Finally, Plaintiff alleges that the SSU Unit 2A was created, and he was transferred to it, as a retaliatory measure after the

---

[8] Plaintiff alleged that he was deprived of certain educational and employment opportunities while housed in SSU Unit 2A.  Following discovery, however, it is clear that Plaintiff did enjoy educational and employment opportunities in SSU Unit 2A, though they differed from the activities in which he had been previously engaged in the general population unit.  In any event, an inmate has no liberty or property interest in a particular prison job, or any prison job.  See James v. Quinlan, 866 F.2d 627, 629-30 (3d Cir.), cert. denied, 493 U.S. 870 (1989); Bryan v. Werner, 516 F.2d 233, 240 (3d Cir. 1975).

[9] Moreover, Plaintiff received a timely post-transfer classification review and a statement of the reasons for his transfer.  He elected not to appeal the denial of his administrative remedy.  Cf. N.J.Ct.R. 2:2-3.

21

death penalty was abolished in New Jersey, to show that the Governor and the state administration were still hard on crime.

Retaliation claims survive Sandin, even when the retaliatory action does not involve a liberty interest. Allah v. Seiverling, 229 F.3d 220, 223-24 (3d Cir. 2000). To prevail on a retaliation claim, a plaintiff must demonstrate that (1) he engaged in constitutionally-protected activity; (2) he suffered, at the hands of a state actor, adverse action "sufficient to deter a person of ordinary firmness from exercising his [constitutional] rights;" and (3) the protected activity was a substantial or motivating factor in the state actor's decision to take adverse action. Rauser v. Horn, 2001 WL 185120 (3d Cir. 2001) (quoting Allah, 229 F.3d at 225). See also Anderson v. Davila, 125 F.3d 148, 160 (3d Cir. 1997) (citing Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274 (1977)); Thaddeus-X v. Blatter, 175 F.3d 378, 386-99 (6th Cir. 1999), cited with approval in Allah, 229 F.3d at 225.

Here, however, Plaintiff has failed to tie the creation of the SSU Unit 2A, and his transfer thereto, to any constitutionally-protected activity in which he was engaged. He has failed to establish that the restrictions in the SSU Unit 2A are sufficiently adverse to deter a person of ordinary firmness from exercising his constitutional rights. He has failed to present any evidence of retaliation, alleging in his deposition

22

that it was simply the logical conclusion to draw, that the creation of this unit was the result of the abolishment of capital punishment in New Jersey.  (Motion, Decl. of Daniel Vannella, Tr. of Plaintiff's Deposition at 156-63 (July 29, 2010).)  The Moving Defendants are entitled to summary judgment on Plaintiff's due process and retaliation claims.

C.   <u>Access-to-Courts Claim</u>

Plaintiff alleges that he was not able to prepare "meaningful" briefs in support of his petition for certification in his state appeal of his criminal conviction and in support of his federal petition for writ of habeas corpus.

The constitutional right of access to the courts is an aspect of the First Amendment right to petition the government for redress of grievances.  <u>Bill Johnson's Restaurants, Inc. v. NLRB</u>, 461 U.S. 731, 741 (1983).  In addition, the constitutional guarantee of due process of law has as a corollary the requirement that prisoners be afforded access to the courts in order to challenge unlawful convictions and to seek redress for violations of their constitutional rights.  <u>Procunier v. Martinez</u>, 416 U.S. 396, 419 (1974), <u>overruled on other grounds</u>, <u>Thornburgh v. Abbott</u>, 490 U.S. 401, 413-14 (1989).  <u>See also</u> <u>Peterkin v. Jeffes</u>, 855 F.2d 1021, 1036 n.18 (3d Cir. 1988) (chronicling various constitutional sources of the right of access to the courts).

23

In <u>Bounds v. Smith</u>, 430 U.S. 817, 828 (1977), the Supreme
Court held that "the fundamental constitutional right of access
to the courts requires prison authorities to assist inmates in
the preparation and filing of meaningful legal papers by
providing prisoners with adequate law libraries or adequate
assistance from persons trained in the law."  The right of access
to the courts is not, however, unlimited.  "The tools [that
Bounds] requires to be provided are those that the inmates need
in order to attack their sentences, directly or collaterally, and
in order to challenge the conditions of their confinement.
Impairment of any <u>other</u> litigating capacity is simply one of the
incidental (and perfectly constitutional) consequences of
conviction and incarceration."  <u>Lewis v. Casey</u>, 518 U.S. 343, 355
(1996) (emphasis in original).

There is no "abstract, freestanding right to a law library
or legal assistance, [and] an inmate cannot establish relevant
actual injury simply by establishing that his prison's law
library or legal assistance program is subpar in some theoretical
sense.  ...  [T]he inmate therefore must go one step further and
demonstrate that the alleged shortcomings in the library or legal
assistance program hindered his efforts to pursue a [non-
frivolous] legal claim.  He might show, for example, that a
complaint he prepared was dismissed for failure to satisfy some
technical requirement which, because of deficiencies in the

24

prison's legal assistance facilities, he could not have known. Or that he had suffered arguably actionable harm that he wished to bring before the courts, but was so stymied by inadequacies of the law library that he was unable to file even a complaint." Lewis, 518 U.S. at 351.

In describing the scope of services which must be provided by the state to indigent prisoners, the Supreme Court has stated, "[i]t is indisputable that indigent inmates must be provided at state expense with paper and pen to draft legal documents, with notarial services to authenticate them, and with stamps to mail them. ... This is not to say that economic factors may not be considered, for example, in choosing the methods used to provide meaningful access. But the cost of protecting a constitutional right cannot justify its total denial." Bounds, 430 U.S. at 824-25, clarified on other grounds, Lewis v. Casey, 518 U.S. 343. Thus, "there is no First Amendment right to subsidized mail or photocopying. [Instead], the inmates must point to evidence of actual or imminent interference with access to the courts." Reynolds v. Wagner, 128 F.3d 166, 183 (3d Cir. 1997).

In addition, one alternative for providing prisoners meaningful access to the courts is the provision of counsel. See e.g., Bounds, 430 U.S. at 828 (approving the provision of "adequate assistance from persons trained in the law"); Rauso v. Zimmerman, 2006 WL 3717785, *4 (M.D. Pa. 2006) (collecting

cases); <u>Pressley v. Johnson</u>, 2006 WL 2806572, *5 (W.D. Pa. 2006) (collecting cases).

Moreover, a prisoner alleging a violation of his right of access must show that prison officials caused him past or imminent "actual injury." <u>See Lewis</u>, 518 U.S. at 348-55 and n.3 (1996); <u>Oliver v. Fauver</u>, 118 F.3d 175, 177-78 (3d Cir. 1997).

Here, Plaintiff was housed in the SSU Unit 2A from approximately April 3, 2008, through February 18, 2010.  With respect to Plaintiff's direct criminal appeal, the Superior Court of New Jersey, Appellate Division, issued its decision affirming Plaintiff's conviction on August 28, 2008.  <u>State v. Boretsky</u>, 2008 WL 4057972 (N.J.Super. App.Div. Aug. 28, 2008).  The Supreme Court of New Jersey denied certification on November 14, 2008. <u>State v. Boretsky</u>, 197 N.J. 14, 960 A.2d 744 (table) (N.J. 2008). Plaintiff submitted his federal petition for writ of habeas corpus on February 10, 2009, and he filed a 27-page supporting brief, with accompanying exhibits, on July 23, 2009.[10]  That action remains pending.  Thus, Plaintiff was engaged in litigation challenging his conviction during the period of his confinement in the SSU Unit 2A.

Plaintiff has failed, however, to establish that he was denied constitutionally-adequate access to the courts during that

---

[10] On April 28, 2011, this Court received a motion [21] to stay that habeas action, pending resolution of a recently-filed state petition for post-conviction relief.

period and in connection with the afore-mentioned proceedings.
Plaintiff stated, in his depositions, that he did not have access
to hard copies of cases, but that he did have regular weekly
access to computer-based legal research sources.  He was
represented by counsel in his direct appeal.  He also filed
supporting briefs in both his state direct appeal and federal
petition for writ of habeas corpus.  Moreover, Plaintiff has
failed utterly to describe what non-frivolous claims he lost in
those proceedings or to provide any evidence or explanation as to
how the type of legal research access he enjoyed caused him to
lose such an allegedly non-frivolous claim.  The mere fact that
he was unsuccessful in his litigation is not sufficient to
establish "injury."  For example, while Plaintiff asserts that
the computer-based research database was typically several months
out of date, he has failed to identify any case decided in the
months before he filed his briefs that even related to any claims
he had asserted.

Moreover, with respect to Plaintiff's federal habeas claims,
such claims must be exhausted in state court before being
presented in federal court.  See 28 U.S.C. § 2254.  Thus, he had
access to the legal research and arguments presented in state
court with respect to those claims.  In light of the prior
litigation of those claims in state court, Plaintiff has failed
to explain how any limitations on his legal access affected his

27

ability to present his federal habeas claims.  For the foregoing reasons, the Moving Defendants will be granted summary judgment with respect to Plaintiff's claim of denial of constitutionally adequate access to the courts.

D.   RICO Claim

Plaintiff describes his claims as arising, inter alia, under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 et seq.  The RICO statutes impose liability on persons who finance or conduct affairs of otherwise legitimate enterprises by engaging in certain named "racketeering activity," e.g., murder, kidnapping, robbery, extortion, bribery, sale of narcotics, and gambling.  See 18 U.S.C. §§ 1961 and 1962.

Plaintiff has failed utterly to present any evidence supporting a claim that any Defendant has engaged in any of the activities proscribed by § 1961.  Accordingly, the Defendants are entitled to summary judgment with respect to the RICO claims.

F.   Claims Regarding Exercise of Religion

As noted above, Plaintiff asserts that he has been denied the right to free exercise of his religion.  In his deposition, (Motion for Summary Judgment [152], Decl. of Daniel M. Vannella, Ex. 1.), Plaintiff explained that in the general population, in addition to one religious ceremony per week, there were 90-minute religious study classes twice a week and morning prayers, while on SSU Unit 2A, he could attend only one 20-minute religious

study class per week, and one weekly religious service, but there were no morning prayer services.  Plaintiff would prefer additional communal religious activities with prisoners in the general population of the prison.

    1.  <u>First Amendment</u>

The First Amendment to the U.S. Constitution, made applicable to the states by the Fourteenth Amendment, <u>Cantwell v. Connecticut</u>, 310 U.S. 296, 303 (1940), provides, <u>inter</u> <u>alia</u>, that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof... ."  U.S. Const. amend. I.  "Convicted prisoners do not forfeit all constitutional protections by reason of their conviction and confinement in prison," <u>Bell v. Wolfish</u>, 441 U.S. 520, 545 (1979), including the protections of the First Amendment and its directive that no law shall prohibit the free exercise of religion, <u>O'Lone v. Estate of Shabazz</u>, 482 U.S. 342, 348 (1987). "All prisoners must be afforded reasonable opportunities to 'exercise the religious freedom guaranteed by the First and Fourteenth Amendment.'"  <u>Small v. Lehman</u>, 98 F.3d 762, 765 (3d Cir. 1996) (quoting <u>Cruz v. Beto</u>, 405 U.S. 319, 322 n.2 (1972)).

Once a sincerely held religious belief is demonstrated, an inmate may establish that a prison regulation or practice violates the right to free exercise of religion by showing that it violates the "reasonableness test" set forth in <u>Turner v.</u>

29

Safley, 482 U.S. 78, 89 (1987), and O'Lone, 482 U.S. at 349.[11]
The standards delineated in Turner and O'Lone indicate that when
a prison regulation or practice encroaches upon prisoners' rights
to free exercise of their religion, the regulation is valid if it
is reasonably related to a legitimate penological interest.
Turner, 482 U.S. at 89; O'Lone, 482 U.S. at 349.  In applying
this standard, courts must weigh four factors:  first, whether
the regulation bears a "valid, rational connection" to a
legitimate and neutral governmental objective; second, whether
prisoners have alternative ways of exercising the circumscribed
right; third, whether accommodating the right would have
deleterious impact on other inmates, guards, and the allocation
of prison resources generally; and fourth, whether alternatives
exist that "fully accommodate[] the prisoner's rights at de
minimis cost to valid penological interests."  Turner, 482 U.S.
at 91.

Here, the creation of a secure unit for prisoners convicted
of murder bears a valid, rational relation to legitimate security

---

[11] More recently, in Employment Division, Dept. of Human
Resources v. Smith, 494 U.S. 872, 878-79 (1990), the Supreme
Court held that neutral laws of general applicability that
incidentally impinge on religious practices do not violate the
Free Exercise Clause.  No federal Court of Appeals has yet held
that the Smith test supplants the Turner and O'Lone analysis in
the prison context.  See Levitan v. Ashcroft, 281 F.3d 1313 (D.C.
Cir. 2002) and cases cited therein.  See also Fraise v. Terhune,
283 F.3d 506, 515 n.5 (3d Cir. 2002) (acknowledging the issue,
but declining to reach it in the absence of either party urging
application of Smith).

concerns.  Certainly, as advanced by the Moving Defendants, the
policy of permitting prisoners within the SSU Unit 2A to gather
for group services only within the Unit is reasonably related to
a legitimate penological interest in security.  Plaintiff does
not deny that he has alternative ways of exercising his religious
observances:  he can participate in weekly religious study
classes and can observe religious holidays.  He has a Rabbi
available to him.  Indeed, the only limitations of which he
complains are that he is not permitted to practice with his
"congregation," presumably, general population inmates housed in
other units, and that he does not have as many communal
activities, such as morning prayers and study groups, as general
population inmates.  It is clear, however, that those limitations
arise from the staffing and security concerns that would result
from bringing SSU Unit 2A and general population prisoners
together on a daily basis.  (Motion, Decl. of James Keil.)
Plaintiff is not prohibited from privately studying his religion
or from privately engaging in morning prayers.  In his
deposition, he did not state that his religious beliefs require
him to participate in these activities in a group setting, but
merely that he preferred that mode of practice.  Finally,
acceding to Plaintiff's request for daily religious activities
with prisoners in other units clearly would have had more than a
de minimis impact on the state's legitimate staffing and security

31

concerns.  Thus, the Turner factors weigh strongly in favor of
the prison policy of restricting exercise of religious activities
within the SSU Unit 2A.  See, e.g., Fraise v. Terhune, 283 F.3d
506 (3d Cir. 2002).  Plaintiff received the opportunity to
practice the essential aspects of his faith within the SSU Unit
2A.  The Moving Defendants are entitle to summary judgment with
respect to this claim.

    2.  RLUIPA

    In addition, the Religious Land Use and Institutionalized
Persons Act, 42 U.S.C. §§ 2000cc to 2000cc-5, protects the
exercise of religious freedom by prisoners confined in
institutions that receive federal funding.

> No government shall impose a substantial burden on the
> religious exercise of a person residing in or confined
> to an institution, ... even if the burden results from
> a rule of general applicability, unless the government
> demonstrates that imposition of the burden on that
> person –
> (1) is in furtherance of a compelling governmental
> interest; and
> (2) is the least restrictive means of furthering that
> compelling governmental interest.

42 U.S.C. § 2000cc-1.

    A "substantial burden exists where: "(1) a follower is
forced to choose between following the precepts of his religion
and forfeiting benefits otherwise generally available to other
inmates versus abandoning one of the precepts of his religion in
order to receive a benefit; or (2) the government puts
substantial pressure on an adherent to substantially modify his

32

behavior and to violate his beliefs." See Washington v. Klem, 497 F.3d 272, 280 (3d Cir. 2007).

Nevertheless, as the Supreme Court has noted, RLUIPA is not to be read "to elevate accommodation of religious observances over an institution's need to maintain order and safety." Cutter v. Wilkinson, 544 U.S. 709, 722 (2005). Instead, Congress intended for courts to give "'due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources.'" Id. at 722-23 (quoting S.Rep. No. 103-111, at 10, U.S.C.C.A.N. 1993, pp. 1892, 1899, 1900).

Here, to be sure, general population prisoners in units other than SSU Unit 2A enjoyed more frequent communal religious activities, such as the daily morning prayer and twice-weekly study groups referred to by Plaintiff. This difference in frequency of communal religious activities, however, does not amount to imposition of a "substantial burden" on Plaintiff's religious exercises. He has not made any argument that such communal activities are a required part of his faith. He does not argue that he is pressured to violate his beliefs, nor does he argue that he is forced to choose between his religious beliefs and receiving a benefit available to other prisoners. Certainly, he has presented no evidence of a substantial burden.

33

Even if the limitations on group religious activities did amount to a substantial burden, which this Court does not concede, the Moving Defendants have shown a compelling government interest in staffing and security served by the policy to prohibit SSU Unit 2A prisoners from participating in daily and weekly communal religious activities with prisoners in other units.  Moreover, this Court agrees with the Moving Defendants that the policy permitting SSU Unit 2A prisoners to practice their faiths within the Unit, only, rather than through daily excursions into other units of the prison, is the least restrictive means of furthering the government's legitimate interests in staffing and security. The Moving Defendants are entitled to summary judgment with respect to this claim.

H.   <u>Eighth Amendment Conditions-of-Confinement Claims</u>

This Court has noted, above, the Plaintiff failed to exhaust his Eighth Amendment conditions of confinement claims.   In addition, they are meritless.

The Eighth Amendment to the United States Constitution, applicable to the individual states through the Fourteenth Amendment, prohibits the states from inflicting "cruel and unusual punishments" on those convicted of crimes.  <u>Rhodes v. Chapman</u>, 452 U.S. 337, 344-46 (1981).  This proscription against cruel and unusual punishments is violated by the "unnecessary and wanton infliction of pain contrary to contemporary standards of

34

decency." Helling v. McKinney, 509 U.S. 25, 32 (1993). It is well settled that "the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." Id. at 31.

Here, in his deposition, Plaintiff acknowledged that he had not been diagnosed with any serious illness as the result of any toxins in the environment. More fundamentally, he failed to provide any factual support for the allegations that he had been exposed to toxins at New Jersey State Prison. (Motion, Vannella Decl., Ex. 2.)

The Moving Defendants are entitled to summary judgment on this claim.

I.   Allegations of Conspiracy

Plaintiff alleges generally that the defendants were engaged in a "conspiracy" to deprive him of his constitutional rights and to retaliate against him.

In order to demonstrate a "conspiracy," "a plaintiff must show that two or more conspirators reached an agreement to deprive him or her of a constitutional right 'under color of state law.'" Parkway Garage, Inc. v. City of Philadelphia, 5 F.3d 685, 7000 (3d Cir. 1993), abrogated on other grounds, United Artists Theatre Circuit, Inc. v. Township of Warrington, 316 F.3d 392 (3d Cir. 2003) (quoting Adickes v. S.H. Kress & Co., 398 U.S. 144, 150 (1970)). Agreement is the sine qua non of a conspiracy.

35

To state a claim for conspiracy under § 1983, a plaintiff must make "factual allegations of combination, agreement, or understanding among all or between any of the defendants [or coconspirators] to plot, plan, or conspire to carry out the alleged chain of events." Hammond v. Creative financial Planning Org., 800 F.Supp. 1244, 1249 (E.D. Pa. 1992) (citing Ammlung v. City of Chester, 494 F.2d 811, 814 (3d Cir. 1974)).

Here, in the first instance, Plaintiff has failed to demonstrate any violation of his constitutional rights.  In addition, Plaintiff has failed to provide any evidence showing an agreement or plan formulated and executed by any of the Defendants to achieve a conspiracy.  Absent such evidence, Plaintiff's bald allegations of conspiracy are insufficient to establish a claim.  See, e.g., Swanson v. Miller, 55 Fed.Appx. 871, 2003 WL 150046 (10th Cir. Jan. 22, 2003) (upholding dismissal of conclusory allegations of conspiracy).  The Moving Defendants are entitled to summary judgment on this claim.

E.    Claims for Failure to Train and/or Supervise

Plaintiff alleges that various defendants are liable to him for their failure to properly train and supervise subordinates, who then violated his constitutional rights.

Where a need for "more or different training ... is so obvious, and the inadequacy so likely to result in constitutional violations, that the failure to train ... can fairly be said to

36

represent official policy," <u>City of Canton</u>, 489 U.S. at 390, and

that failure to train "actually causes injury," a supervisor may

be held liable, <u>Id.</u>

In addition, in resolving the issue of supervisory

liability,

> the focus must be on adequacy of the training program
> in relation to the tasks the particular officers must
> perform.  That a particular officer may be
> unsatisfactorily trained will not alone suffice to
> fasten liability on the [supervisor], for the officer's
> shortcomings may have resulted from factors other than
> a faulty training program. ... Neither will it
> suffice to prove that an injury or accident could have
> been avoided if an officer had had better or more
> training ... .  Moreover, for liability to attach ...
> the identified deficiency in a city's training program
> must be closely related to the ultimate injury.

<u>Id.</u> at 390-91.

Here, however, Plaintiff has failed to present evidence

establishing any violation of his constitutional rights.

Accordingly, there can be no liability for failure to train

and/or supervise.  The Moving Defendants are entitled to summary

judgment as to this claim, also.

## V.   CONCLUSION

For the reasons set forth above, the Motion [152] for

Summary Judgment will be granted.   An appropriate order follows.

Garrett E. Brown, Jr.
Chief Judge
United States District Court

Dated: *June 30, 2011*

37